UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ANTHONY VIGEANT, | ) | CASE NO. CV 15-628-GW (PJW) |
| Petitioner, | ) ) | |
| v. | ) ) | FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| JEFF MACOMBER, | ) ) | |
| Respondent. | ) ) ) | |

This Final Report and Recommendation is submitted to the Hon. George H. Wu, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.  For the reasons discussed below, it is recommended that the Petition be denied and the action be dismissed with prejudice.[1]

_____

[1]  This Final Report and Recommendation has been issued to address arguments raised by Petitioner in his Objections to the original Report and Recommendation.

I.

SUMMARY OF PROCEEDINGS

A.    State Court Proceedings

In July 2009, a jury in Los Angeles County Superior Court found Petitioner guilty of first degree murder with special circumstances, first degree attempted home invasion robbery, and first degree residential burglary.  (Clerk's Transcript ("CT") 461-63.)  The jury also found that a principal was armed with a firearm during the commission of the crimes.  (CT 461-63.)  The court sentenced him to life in prison without the possibility of parole plus a consecutive term of five years and six months.  (CT 506-09.)

Petitioner appealed to the California Court of Appeal and concurrently filed a petition for writ of habeas corpus in the same court.  (Lodged Doc. Nos. 7, 10, 16.)  The appellate court reversed the judgment, but not the conviction, finding that the trial court erred when it denied Petitioner's post-trial motion to replace his counsel.  (Lodged Doc. No. 12.)  The case was remanded to the Superior Court with instructions to proceed with new counsel from the point at which Petitioner originally sought to discharge his attorney.  (Lodged Doc. No. 12.)  The appellate court denied his habeas petition.  (Lodged Doc. No. 17.)

Petitioner then filed two petitions for review in the California Supreme Court, challenging the California Court of Appeal's decision in his direct appeal and the denial of his petition for writ of habeas corpus.  (Lodged Doc. Nos. 13, 18, 20.)  The California Supreme Court summarily denied both petitions.  (Lodged Doc. Nos. 15, 21.)

On remand, the Los Angeles County Superior Court appointed new counsel.  (Lodged Doc. No. 23 at 2.)  Petitioner moved for an

evidentiary hearing to address whether prior counsel had been ineffective. He also asked the trial court for a new trial, to strike the special circumstances allegation, and to appoint an expert. (Lodged Doc. No. 24.) The court denied the motions and re-sentenced Petitioner to life without the possibility of parole plus a consecutive term of five years and six months. (Lodged Doc. No. 22 at 815-19.)

Petitioner appealed to the California Court of Appeal, which affirmed the judgment in a written decision. (Lodged Doc. Nos. 25, 28.) He then filed a petition for review in the California Supreme Court, which was summarily denied. (Lodged Doc. Nos. 29, 30.)

B.   Federal Court Proceedings

After exhausting his remedies in state court, Petitioner, represented by counsel, filed a Petition for Writ of Habeas Corpus in this court, pursuant to 28 U.S.C. § 2254, claiming that trial counsel was ineffective for failing to hire a neuropsychologist and for failing to investigate co-defendant Ramon Hernandez's mental condition. (Petition at 5.) Petitioner requested that the Court hold an evidentiary hearing and receive additional evidence to support his claims. (Petition, Attachment at 41; Traverse at 75-76.) That request is denied. Except in exceptional circumstances, which do not exist here, the Court is confined to determining the reasonableness of the state courts' decisions based solely on the evidence that was before the state courts. *See Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). Further, an evidentiary hearing is not warranted where, as here, "the record refutes [Petitioner's] factual allegations or otherwise precludes habeas relief[.]" *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

## II.

### STATEMENT OF FACTS

The following statement of facts was taken verbatim from the California Court of Appeal's opinion affirming Petitioner's conviction:

> At [Petitioner's] trial, Ramon Hernandez testified that he was a charged codefendant in the shooting death of [victim David Pettigrew]. He had pleaded guilty to one count of murder and had admitted the special circumstances that the murder was committed during the course of a residential burglary and during the course of an attempted robbery. He had admitted to the personal use of a firearm and pleaded guilty to the attempted residential robbery and residential burglary counts. He had not yet been sentenced.
>
> Hernandez had not been offered any deal or plea bargain and had not asked for one. He pleaded guilty to accept responsibility for his actions. He was not offered any leniency for testifying and had volunteered to testify because "the truth needs to be out there, and everybody has a right to the truth." He also wanted to bring justice to the victim's family.
>
> Hernandez was a Marine who had done two tours in Iraq. He was injured when a suicide vehicle exploded near him and shrapnel entered his head. He lost his left eye, his sense of smell, his left frontal lobe, and part of his right frontal lobe. He suffered nerve damage in his right arm and hand. His brain injury affected his thinking and caused him to be more emotional than before, but his ability to feel

empathy with others was diminished.  He had also become "very compulsive."  He did things he normally would not have done, and he sometimes processed information more slowly.

Hernandez met fellow Marine [Petitioner] at Camp Pendleton Marine Corps Base.  Shortly thereafter, he met [Petitioner's] cousin, Landers, another Marine.  At some point, Hernandez talked to them about Iraq and his injuries. Hernandez acknowledged that he did not discuss the emotional or psychological issues related to his injuries with Landers and [Petitioner].

Hernandez heard Landers complain about his problems with Pettigrew, whom Hernandez did not know.  Landers said that Pettigrew owed him some cocaine, and [Petitioner] had left his laptop computer with Pettigrew as collateral for the cocaine.  Landers believed that Pettigrew was dodging him. Although Pettigrew had told Landers he could pick up the cocaine at Pettigrew's apartment, Pettigrew would "blow [Landers] off" by turning off his cell phone whenever Landers called him.

Hernandez heard Landers and [Petitioner] threatening Pettigrew over the telephone.  During a period of two and one-half hours, Landers and [Petitioner] left four threatening messages on Pettigrew's voicemail.  This occurred on the night of September 7, 2007, and the early morning of September 8, 2007.

On the evening of September 9, 2007, Hernandez was drinking with [Petitioner] and another Marine at the barracks.  They then went to a party at someone's house.

Landers telephoned [Petitioner] there and asked [Petitioner] to pick him up. [Petitioner] eventually agreed, and Hernandez went with [Petitioner] so as not to be stranded. When Landers joined them, Landers began complaining again about Pettigrew dodging him. Landers said Pettigrew still had not given him his cocaine, and if he had a gun "he would bust a cap in his ass . . . ."

Hernandez told Landers that he had a handgun, whereupon Landers became "excited, very enthusiastic" and asked Hernandez where the gun was located. Landers wanted to get the gun to shoot Pettigrew. [Petitioner] also said he wanted Hernandez to get his gun, and he said he wanted Pettigrew to be killed. The only reason that Hernandez went with Landers and [Petitioner] to Pettigrew's apartment was because Landers and [Petitioner] were looking for someone with a gun.

Hernandez, Landers, and [Petitioner] drove to Hernandez's barracks, a 40-minute drive south, and Hernandez retrieved the gun from his car. They then began driving northward to Long Beach. Landers drove, [Petitioner] was in the front passenger seat, and Hernandez was in the rear seat. At some point during the two-hour drive, Hernandez asked the other men what they wanted him to do, and they said they wanted Pettigrew to be shot. Hernandez told them that there was a difference between being shot and being dead and asked them, "Which one do you want?" Landers said, "I want him dead." [Petitioner] did not say anything, nor did he say, "No." Hernandez then stated that Landers had the lead role,

but [Petitioner] joined in the response that he wanted the man killed.

As they drove northward, Hernandez fired the gun out the window of the car in the Camp Pendleton area. He asked Landers and [Petitioner] more than once what they wanted, and they both said they wanted Pettigrew dead. According to Hernandez, "Plan A was to pick up cocaine. Plan B was to kill somebody, which was Mr. Pettigrew." Hernandez did not like the fact that Pettigrew was messing with fellow Marines.

When they arrived at their destination, they all got out of the car and headed to Pettigrew's apartment complex. Hernandez told Landers that if Landers wanted "this guy" dead, and the guy did not give Landers what he wanted, then Hernandez was going to shoot him, "because you said you want him dead, right?" In response, "they were, like, 'Yeah.'" Landers jumped a fence beside Pettigrew's apartment building to check if Pettigrew's window was open. Landers planned to have all three of them hop the fence and enter Pettigrew's apartment through the window, but he returned because "some lady" saw him. Jennifer Potter, who lived next door to Pettigrew, saw a man walking past her window by means of a walkway that was closed off to tenants and the public. When Potter challenged the man, he said he was locked out and was trying to get in his window. Potter believed she heard a gunshot approximately 20 minutes after she saw the man.

Hernandez asked to see a floor plan of Pettigrew's apartment. Landers made one for him out of twigs and small rocks. Hernandez testified that "the plan was always the

7

same: go in, get this guy to give us the coke, and, if not, that he was supposed to get shot."

The three men entered Pettigrew's building, and Landers lightly turned the door knob of Pettigrew's apartment. Hernandez told Landers that the door was not locked and that he could push it open, which he did.  Landers entered first, then [Petitioner], then Hernandez.  Once they had quietly entered the dark apartment, either Landers or [Petitioner] turned on a lamp.  Hernandez then saw Pettigrew, but Landers and [Petitioner] had already gone through another doorway inside the apartment.  Although the two men were being quiet, Hernandez could hear them moving things around.

Hernandez saw that Pettigrew was passed out.  Pettigrew awoke and saw Hernandez, whom he did not know.  He just looked at Hernandez and said nothing.  Landers and [Petitioner] came back in and saw that Pettigrew was awake. "They were, like, 'Hey, what the fuck?  Where is my coke?'" Both Landers and [Petitioner] were shouting, "Where is the computer.  Where is my shit."  They began yelling at Pettigrew, demanding the coke.

Hernandez noticed that Pettigrew was "on something." Landers asked Pettigrew if he was on Oxycontin, and Pettigrew said he was.  Pettigrew said he would call his connection and get the coke.  Pettigrew pushed some buttons on his cell phone and Landers's phone rang.  Landers looked at his phone and said, "What the fuck? . . . [W]hy are you calling me? Call your dealer."  Landers and [Petitioner] continued to demand that Pettigrew get the cocaine, and Pettigrew again

attempted to make a phone call.  After no more than 20 minutes, Hernandez pulled out his pistol and told Pettigrew he had something that would refresh his memory.  Hernandez jammed the pistol into Pettigrew's right eye socket and said, "You need to make your call.  Call your dealer.  Call whoever you have to call, but get that coke here now."

Pettigrew continued to push buttons on his phone.  Hernandez told him that he would give him 10 seconds.  If Pettigrew had not produced something at the end of those 10 seconds, Hernandez was going to shoot him.  Neither Landers nor [Petitioner] said anything or attempted to stop Hernandez.  Neither told him to put the gun away.  They continued to yell at Pettigrew saying, "When he starts counting and he gets to 10, when he makes it to 10 he is going to shoot you, so hurry up, get on the phone, call your dealer and get the coke here right now."

Hernandez began counting.  He counted very slowly, waiting approximately 10 or 15 seconds between each number.  When he got to 10, he shot Pettigrew from a distance of approximately four feet.  He did so because that is what Landers and [Petitioner] had brought him along to do.  He did it to back up his fellow Marines.  At no time during the count did either man say or do anything to register their objection to Hernandez's shooting Pettigrew.  Landers and [Petitioner] were telling Pettigrew to come up with the stuff or Hernandez would shoot him.

When Hernandez shot Pettigrew, Landers and [Petitioner] were shocked.  Hernandez believed the shock was not caused by

the fact that the shot actually occurred but rather because they were shocked at what they saw – they were not conditioned to see something like that.  They knew they were all there to shoot Pettigrew.  Landers jumped back and said, "Dude, you almost got blood on me."  [Petitioner] just stood there with his mouth and his eyes wide open.  The three men ran to the car.  Landers drove around aimlessly for about half an hour until Hernandez told him that they needed to get back on the freeway.  [Petitioner] was hysterical.  Hernandez explained that, when he said [Petitioner] was "hysterical," he meant that he was speaking very loudly and saying, "Do you think [] he is dead?  Do you think he is dead?  We should go back."  [Petitioner] wanted to see if the police would show up.  He was not crying, and Landers was not crying either.

Hernandez repeated that after he asked Landers and [Petitioner] if they wanted Pettigrew killed, they both answered "yes."  Hernandez asked the same question during the trip between Camp Pendleton and Long Beach, when they got to Long Beach, before they left the barracks, and just before they entered Pettigrew's apartment.  Both Landers and [Petitioner] looked at the gun during the trip, and [Petitioner] played with it until he was told to stop it.  Before the shot was fired, neither Landers nor [Petitioner] told Hernandez not to do it.

Hernandez said that when he told defense counsel on cross-examination that he did not intend to kill Pettigrew, he meant that he did not want him dead.  It was not up to him.  He did not even know him.  However, he was willing to

10

kill him because Landers and [Petitioner] had asked him to do so. The rationale was that Pettigrew was messing with Hernandez's fellow Marines. Hernandez acknowledged that he had previously testified that he shot Pettigrew because Hernandez had given Pettigrew a specific order and Pettigrew had not obeyed it.

After the shooting, the three men drove back to Camp Pendleton, stopping on the way for food at a convenience store. They went to Landers's room and talked about the shooting. They agreed not to say anything and to pretend they did not know each other. They drank and "hung out" for about three more hours. Landers told Hernandez he should have shot Pettigrew two more times to ensure he was dead.

On the day after the shooting, September 10, 2007, Mauricio Rosales, a maintenance man, noticed an apartment door ajar in Pettigrew's building. When he looked inside, he saw a man slumped down on the sofa with a cell phone in his right hand. The man was bloody and was not breathing. Rosales called 911.

Police officers responded to the scene. A nine-millimeter casing and an expended round were collected in the apartment. Dr. Raffi Djabourian, a deputy medical examiner, testified that Pettigrew had a bullet entrance wound at the left temple that exited on the back of the head. The wound was rapidly fatal. The victim was found still holding his cell phone due to a rapid onset of rigor. None of the various drugs found in his system contributed to his death.

Detective Scott Lasch was assigned to the Pettigrew murder case along with Detective Malcolm Evans. They did not find any narcotics or drug-dealing paraphernalia in Pettigrew's apartment. They found a laptop computer that was registered to [Petitioner] on the rear seat of Pettigrew's truck. Detective Lasch discovered that a parking citation was issued to [Petitioner] on September 6, 2007 (three days before the shooting), in the area of Orizaba Avenue in Long Beach, near Pettigrew's apartment.

By means of Pettigrew's cell phone records, the investigating officers established that calls were made from Landers's and [Petitioner's] cell phones to Pettigrew on the night of his death and two days before his death. Two days before the shooting, [Petitioner] said: "Hey what's up brotha. I know you know who this is. It's fuckin' Tony. And dude, fuckin', eh-heh, if you don't stop playing games, it's gonna get ugly dude. And, fuckin', I'm gonna come to your house. And it's gonna be all bad. So hit me back, ASAP. Late." Fifty-three minutes later, [Petitioner] left the following message: "Dave you better fuckin' hit me back right now dude. Fuckin', me and my cousin, we ain't playin' dude. You fuckin' hit us back up or I'll fuckin' find your ass dude. Hit me up. Late."

In between [Petitioner's] two messages, Landers left a message stating, "Hey Dave, you better fuckin' call me back bro." Shortly after midnight, on September 8, 2007, [Petitioner] left the following message: "Dave, don't even play dude. Fuckin', me and my b-me and my homeboy Tre,

12

fuckin', are ready to rumble dude.  Fuckin, pick up your phone dude or it's gonna get ugly.  Just to let you know.  Nobody fuckin' robs me dude.  No one.  So, it's in your best interest to pick up your phone, otherwise it's gonna get really ugly, and we know where to find you.  Not only at your apartment, but we got fuckin' military fuckin' aspect.  Fuckin', we know where to look man.  You're fucked if you try to run.  Alright . . . .  Hit me up.  See if I'm playing.  Late."

Detective Bryan McMahon investigated cell site hits for telephones linked to Landers and [Petitioner].  He discovered that the hits on the cell sites during the evening of Pettigrew's death began near Camp Pendleton and proceeded north along the coast, the No. 5 freeway, the No. 22 freeway, and all the way to Long Beach.  A cluster of hits at a certain point led the investigators to go to that location, and they located a gas station near that spot.  The investigators obtained footage from the gas station's security cameras that showed [Petitioner], Landers, and Hernandez pulling up to the pumps at 8:40 p.m.  They all got out of the car.  [Petitioner] is seen talking on his cell phone, and Landers also used his cell phone.  The footage showed Landers driving away from the gas station at 8:51 p.m.

Detective Dennis Robbins assisted in the investigation of Pettigrew's murder.  After Landers was arrested in the Bay Area by United States Marshal[]s, Detective Robbins interviewed Landers in the Contra Costa County jail on September 27.  When shown a photograph of his cousin,

[Petitioner], Landers said he did not know him.  Landers said he did not know Hernandez when shown a photograph of him. Landers said he had not been in Long Beach in the preceding weeks.  Landers acknowledged that he was due back at Camp Pendleton on September 24, 2007, and he failed to show up. He said it was because he had been scheduled to go to Iraq on September 28, and he did not want to go.

Detective McMahon testified that he made a series of phone calls to [Petitioner] on September 23, 2007, between 4:32 p.m. and 6:45 p.m.  Not all of the calls were answered. An audio recording of the calls was played for the jury. [Petitioner] exchanged pleasantries with the detective, beginning with "How's it going man?" when the detective introduced himself.  When asked if he knew anybody that had recently been murdered down in Long Beach, [Petitioner] merely replied, "Negative."  When told that the "guy's name was David and asked if the name rang a bell, [Petitioner] said "Yes."  When Detective McMahon then asked "What's that?," [Petitioner] said he had left his laptop "down there."  He said David was his cousin's friend.  He then said his cousin, named Trevor Landers, had met David a couple of times.  [Petitioner] said he lent Pettigrew the laptop "a couple of months" earlier.  [Petitioner] denied several times having spoken to Pettigrew on his phone just after midnight on September 8, 2007.  He said he had never been to Pettigrew's home in Long Beach.  [Petitioner] said that Landers knew Pettigrew from school.  When the detective asked [Petitioner] how he could be contacted, [Petitioner] replied

14

that he had just moved into his barracks two weeks earlier and was not sure the detective could contact him there. When asked again about phone calls to Pettigrew, [Petitioner] claimed he had lent his phone to a friend named Hernandez, but Hernandez did not know Pettigrew. [Petitioner] had not seen Pettigrew in "probably like a month." [Petitioner] expressed no curiosity when the detective stated that he was trying to figure out what happened to Pettigrew. [Petitioner] merely replied, "Yeah." When the detective told [Petitioner] that Pettigrew was murdered, [Petitioner] expressed surprise.

[Petitioner] told the detective that he had gone to a going-away party at the home of a Corporal Schrader on September 8, 2007, a Saturday. He was at the party from 4:00 or 5:00 until 1:00 or 2:00 the next morning. He then said he called Pettigrew from the party to ask for his laptop. In a subsequent phone call, Detective McMahon clarified to [Petitioner] that the murder took place on Sunday, September 9. [Petitioner] said he was alone that day, "just chilling."

Detective McMahon interviewed Hernandez on September 29, 2007. Hernandez initially denied going to Long Beach. After being told that another suspect was in custody, Hernandez related the events on the night of the murder. An audio recording of Hernandez's interview was played for the jury.

Detective McMahon retrieved Hernandez's gun from a location in Tempe, Arizona, where Hernandez had directed him to look. The gun was a Browning high-power nine-millimeter weapon []. Troy Ward, a criminalist with the Long Beach

Police Department, confirmed that Hernandez's firearm matched the shell casing found at the scene of Pettigrew's shooting. (Lodged Doc. No. 28 at 2-10.)

### III.

### STANDARD OF REVIEW

The standard of review in this case is set forth in 28 U.S.C. § 2254:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law if it applies a rule that contradicts Supreme Court case law or if it reaches a conclusion different from the Supreme Court's in a case that involves facts that are materially indistinguishable. *Bell v. Cone*, 535 U.S. 685, 694 (2002).  To establish that the state court unreasonably applied federal law, a petitioner must show that the state court's application of Supreme Court precedent to the facts

of his case was not only incorrect but objectively unreasonable. *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Petitioner raised his claim in his petition for review in the California Supreme Court, but that court did not explain its reasons for denying it.  The appellate court, however, did, which this Court presumes is the basis for the state supreme court's subsequent decision denying the claim.[2]  In this situation, the Court looks to the appellate court's reasoning and will not disturb it unless it concludes that "fairminded jurists" would all agree that the decision was wrong.  *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013) (approving reviewing court's "look through" to last reasoned state-court decision); *see also Wilson v. Sellers*, ___ U.S. ___, 2018 WL 1800370, at *5 (2018) (concluding "federal habeas law employs a 'look through' presumption").

IV.

DISCUSSION

Petitioner claims that his trial counsel was ineffective because he failed to investigate Hernandez's mental infirmities.  (Petition at 5.)  He argues that counsel should have hired a neuropsychologist to help him prepare for trial and to testify about "the effects of Hernandez's mental deficiencies on his memory and actions."  (Petition, Attachment at 17.)  For the following reasons, the Court

---

[2]  Petitioner first raised his ineffective assistance claim in a habeas petition in the California Court of Appeal, which rejected it on the ground that Petitioner had not established prejudice.  (Lodged Doc. Nos. 16, 17.)  He thereafter raised it on appeal following remand.  (Lodged Doc. No. 25 at 35-38.)  This time, the appellate court found both that counsel's performance was not deficient and that there was no prejudice.  (Lodged Doc. No. 28 at 11-21.)  It is this last decision that the Court addresses.

concludes that the state courts' finding that Petitioner did not establish prejudice as a result of counsel's performance was supported by the record and that not all fairminded jurists would disagree.  As such, Petitioner is not entitled to relief.

A defendant in a criminal case has a constitutional right to effective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To establish that counsel was ineffective, a petitioner must prove that counsel's performance was objectively unreasonable and that he was prejudiced as a result.  *Id.* at 687–88, 694.  With respect to the prejudice component, *Strickland* requires that a petitioner demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 104.  Because the California Court of Appeal adjudicated the prejudice issue on the merits, "the state court's determination [must be allowed] to stand unless it is contrary to or an unreasonable application of federal law or is based on an unreasonable determination of the facts."  *Mann v. Ryan*, 828 F.3d 1143, 1155 (9th Cir. 2016) (en banc).  Thus, the "pivotal question is whether the state court's application of *Strickland* was unreasonable."  *Richter*, 562 U.S. at 101.  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Id*.  As such, in reviewing ineffectiveness claims, the Court applies a "doubly deferential" standard of review.  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

The thrust of Petitioner's argument is that, had his counsel investigated Hernandez's impairments and hired an expert to testify at trial about these impairments, he could have established that

Hernandez did not have the capacity to "perceive, comprehend and report what [Petitioner] purportedly perceived, comprehended and intended," which would have caused the jury to acquit Petitioner.[3] (Petition at 31-32.)

The California Court of Appeal reviewed the medical records and the experts' opinions, which were attached to Petitioner's habeas corpus petition, and found that Petitioner did not prove that he was prejudiced by counsel's failure to investigate Hernandez's medical condition or to retain an expert to testify at trial:

> Hernandez's medical records reveal little regarding any mental deficits he may have suffered from as a result of the injury to his head. Most of the entries involve his rehabilitation after his injury and various physical problems, unrelated to his injury, that he suffered over the years since 2004. A report of a neuropsychological evaluation in October 2004 states that Hernandez had intact perceptual and spatial skills, language, attention, learning, and auditory memory ability. Hernandez exhibited extremely strong skills in his ability to recall a general fund of information and in visual memory ability. Cognitive flexibility was somewhat weak but deemed likely to

---

[3] In support of this argument in state court, Petitioner submitted declarations from Dr. Harvey Dondershine, a clinical neuropsychiatrist, Dr. Kathleen Toups, a psychiatrist, and Dr. Timothy Collister, a clinical neuropsychologist, as well as relevant excerpts from Hernandez's medical records. (Petition at 15-16 and Exh. E at 37-47, Exh. F at 48-49, Exh. G at 50-235. Exh. H at 236-76.) Dr. Dondershine opined that Hernandez's brain injury, related seizures, and post-traumatic stress disorder would have impaired his competency to testify and caused him to engage in impulsive, "inappropriate" behavior. (Petition at 22-26.) Dr. Collister opined that Hernandez's head injury would likely have explained the discrepancies in his testimony and his intent in killing Pettigrew. (Petition at 26-28.)

improve.  This evidence would have given the prosecutor a strong counterpoint to any defense expert testimony about Hernandez's defects.  This evidence, combined with Hernandez's demeanor and frankness before the jury, leaves little possibility that his testimony at the trial of [Petitioner] and Landers would have been discredited to a greater degree than it already was.  Furthermore, as we explained in our opinion in [Petitioner's] and Landers' appeals, Hernandez's testimony was substantially corroborated by independent evidence.  (*People v. Landers*, *supra*, B218366.)

(Lodged Doc. No. 28 at 19-20.)

Petitioner argues that the appellate court's prejudice analysis was unreasonable because he is convinced that the testimony proffered by Drs. Dondershine and Collister would have caused the jury to question Hernandez's credibility as a witness.  (Traverse at 52-53.)  Petitioner contends that evidence of Hernandez's brain injury would have shown the jury that Hernandez had a diminished capacity to "perceive, comprehend[,] and accurately report Petitioner's intent to commit the charged crimes."  (Traverse at 28-29.)  The Court rejects these arguments.

This was not a close case.  Hernandez's testimony was damning, to be sure, and played an important role in Petitioner's conviction.  But it was not the only evidence or the most compelling evidence establishing Petitioner's intent.  Petitioner threatened Pettigrew in three voice mail messages just days before the murder.  (RT 1285-86.)  In the first, Petitioner told Pettigrew that, "If you don't stop playing games, it's gonna get ugly, dude.  And, fuckin', I'm gonna come to your house.  And it's gonna be all bad."  (Supp. Clerk's Transcript, Lodged Doc. No. 2 ("SCT") 01.)  In the second, Petitioner

20

warned Pettigrew, "Dave you better fuckin' hit me back right now dude. Fuckin', me and my cousin, we ain't playin' dude. You fuckin' hit us back up or I'll fuckin' find your ass dude. Hit me up." (SCT 01.) In the third voice mail, Petitioner told Pettigrew:

> Dave, don't even play dude. Fuckin', me and my b-me and my homeboy Tre,[4] fuckin', are ready to rumble dude. Fuckin', pick up your phone dude or it's gonna get ugly. Just to let you know. Nobody fuckin' robs me dude. No one. So, it's in your best interest to pick up your phone, otherwise it's gonna get really ugly, and we know where to find you. Not only at your apartment, but we got fuckin' military fuckin' aspect. Fuckin', we know where to look man. You're fucked if you try to run.

(SCT 02.)

These calls supported the prosecution's argument that Petitioner wanted Hernandez to shoot Pettigrew. The evidence from the night of the murder also supports that view. The three men took a 40-minute detour to the Marine barracks to retrieve a gun in Hernandez's car that they could use to shoot Hernandez. Once they got it, Petitioner and the others took turns handling the gun while they drove for two hours from the barracks to Long Beach. During the drive, Hernandez fired the gun out the car window. Petitioner and Landers actively encouraged Hernandez to kill Pettigrew while the three drove to Long Beach. Hernandez agreed to kill him even though he did not know Pettigrew and, in fact, had never met him.

Once inside Pettigrew's apartment, Petitioner joined Landers and Hernandez in threatening Pettigrew. Hernandez then pulled out the gun, stuck it in Pettigrew's face, and told Pettigrew that if he did

---

[4]  Codefendant Landers' first name is Trevor.

21

not make a phone call to get the cocaine by the time Hernandez counted to ten that Hernandez was going to shoot him.  Instead of urging Hernandez to stop during the elongated countdown that followed, Petitioner (and Landers) continued to threaten Pettigrew and told him that Hernandez would shoot him if he did not comply.  Sure enough, when Hernandez reached ten and Pettigrew had not complied, Hernandez shot and killed him.

After the murder, Petitioner fled with the others and spent hours with them concocting a scheme to avoid suspicion if confronted by police.  When later questioned by police, consistent with that plan, Petitioner lied, claiming that he did not know his cousin Landers and did not know about Pettigrew's murder.  This evidence was more than enough to establish Petitioner's intent that night.

Petitioner makes much of the fact that, in the course of his lengthy testimony, Hernandez testified that he thought that Petitioner's reaction to the shooting was because he had never seen anyone shot before, not because he was surprised that Hernandez actually pulled the trigger.  In Petitioner's view, it seems, this testimony alone was what caused the jury to conclude that Petitioner wanted Hernandez to murder Pettigrew.  Petitioner is simply wrong. This testimony was the least persuasive part of Hernandez's testimony and the least important part of the evidence establishing Petitioner's intent.  It was all the other things that Petitioner did and said in the days leading up to the killing and on the night of the killing that established what Petitioner was thinking.  Hernandez's testimony about what he thought Petitioner was thinking, though consistent with the other evidence, was not that compelling.  Nor is Petitioner's argument that counsel was ineffective for failing to have a

22

psychologist testify that Hernandez did not have the wherewithal to analyze Petitioner's feelings.  Thus, even assuming that counsel should have hired an expert to challenge Hernandez's testimony, the state appellate court was right to conclude that there was no prejudice in not doing so.

As to Petitioner's argument that an expert could have assisted counsel in establishing that Hernandez's memory of the facts was shaky, the record undermines this argument as well.  Much of Hernandez's testimony was corroborated by other evidence.  For example, Hernandez testified that he was present in the days leading up to the murder when Petitioner and Landers left threatening messages on Pettigrew's voice mail.  The recorded messages on Pettigrew's voice mail corroborated that testimony.  Hernandez testified that, on the night of the murder, he, Petitioner, and Landers drove 40 minutes south to Hernandez's barracks to retrieve Hernandez's gun before turning around and retracing their steps to go to Long Beach to kill Pettigrew.  This testimony was corroborated by cell phone records that showed that their phones had pinged off cell towers on the route Hernandez described.  Hernandez claimed that the three men stopped at a convenience store on the way to Long Beach.  This testimony was corroborated by a video from a gas station surveillance camera showing the three men together at the convenience store on the night of the murder.  Hernandez testified that, when they arrived at Pettigrew's apartment complex, Landers jumped over a fence to see if a window was open in Pettigrew's apartment and was seen by a neighbor, with whom he exchanged words.  This testimony was corroborated by the neighbor. Hernandez testified that, when they confronted Pettigrew in the apartment and ordered him to call his drug dealer, Pettigrew dialed

Landers' number by mistake.  This testimony was corroborated by cell phone records.  Thus, Petitioner's argument that a neuropsychiatrist or psychologist could have helped counsel make clear to the jury that Hernandez's memory was faulty and that, by doing so, the jury would not have unanimously voted to convict is not persuasive and, therefore, the appellate court's ruling that Petitioner failed to establish prejudice on this claim will not be disturbed.

Finally, Petitioner claims that his counsel was unable to properly prepare for trial and to effectively cross-examine Hernandez because counsel did not have a medical expert explaining to him the nature of Hernandez's impairments and how they interfered with his perception and memory.  The record does not support this argument, either.  Hernandez testified over the course of two days.  He was questioned by the prosecutor and extensively cross-examined by Petitioner's counsel and Landers' counsel.  During the course of his testimony, Hernandez explained the nature of his injuries and how they impacted his cognitive abilities.  He readily admitted that he was drunk on the night of the murder and did not remember everything.  He conceded more than once that he was confused and that he could not remember.  Defense counsel repeatedly tripped him up with his prior testimony.  Still, at the end of the day, the jury was presented with a former marine who readily admitted that he, Petitioner, and Landers went to Pettigrew's apartment with a gun so that Hernandez could kill Pettigrew.  The jury heard Petitioner's and Landers' recorded threats on Pettigrew's voice mail.  They also heard Hernandez testify that Petitioner and Landers had repeatedly asked Hernandez to kill Pettigrew.  Petitioner's argument that, had an expert been retained, the outcome would have been different is not supported by this record.

More importantly, the state appellate court's finding that Petitioner failed to establish that any alleged ineffectiveness did not cause prejudice is not one that "fairminded jurists" would all agree was wrong.  As such, the Petition is denied.  *Richter*, 562 U.S. at 102.[5]

V.

RECOMMENDATION

For these reasons, IT IS RECOMMENDED that the Court issue an Order (1) accepting this Final Report and Recommendation and (2) directing that Judgment be entered denying the Petition and dismissing the case with prejudice.[6]

DATED: April 25, 2018

_Patrick J. Walsh_

PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-State Habeas\VIGEANT, A 628\Final R&R.wpd

---

[5]  Petitioner also submitted declarations from his mother and from several attorneys (James Gregory, Gregorio Ramon, Leslie Conrad, and Randall Riccardo) in an effort to establish that trial counsel was ineffective.  The Court need not address this evidence because it has concluded that, even assuming that counsel was ineffective for not hiring an expert, there was no prejudice.  *See Strickland*, 466 U.S. at 697 (holding ineffective assistance claim must be denied if petitioner cannot establish prejudice, regardless of whether counsel's perform-ance was deficient).

[6]  The Court is not inclined to issue a certificate of appealability in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").  If Petitioner believes a certificate should issue, he should explain why in his Objections to the Final Report and Recommendation.